IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

v.

GERMAINE LEWIS
JUSTICE HARRIS

Defendants.

CRIMINAL NO.
22-341

## OPINION

Slomsky, J.                                                    January 12, 2024

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................... 3

II.   FINDINGS OF FACT ..................................................................................... 6

      A.  Robbery at Walmart Store and Viewing of Surveillance Footage ......................... 6

      B.  Officer Vincent Pinto Positions his Police Vehicle on Roosevelt Boulevard .......... 7

      C.  Officer Vincent Pinto Follows the Jeep to Bridge Street ........................................ 8

      D.  Pursuit of Fleeing Jeep down Roosevelt Boulevard .................................................. 9

      E.  Pursuit On Foot and Arrest of Defendant Germaine Lewis ................................. 11

      F.  Search of Defendant Lewis in the Radio Patrol Wagon ........................................ 12

      G.  Show-Up Identification ............................................................................................... 12

      H.  Search of Jeep Pursuant to Valid Search Warrant ............................................... 13

      I.  Arrest of Defendant Justice Harris the Next Day ................................................... 13

III.  CONCLUSIONS OF LAW ........................................................................... 14

**A. Officer Vincent Pinto had Reasonable Suspicion to Stop the Jeep** ........................ 14

**B. Officer Vincent Pinto had Probable Cause to Search Defendant**

**Germaine Lewis Incident to His Arrest** .................................................................. 18

    1. Officer Pinto had Probable Cause to Arrest Defendant Germaine Lewis ................ 18

    2. Officer Vincent Pinto Conducted a Lawful Search of Defendant

        Germaine Lewis Incident to his Arrest .................................................................. 19

**C. Defendants Lewis and Harris do not have Standing to Challenge**

**the Search of the Jeep** ............................................................................................. 20

    1. Defendants Lewis and Harris do not have Standing to Challenge

        the Search of the Jeep .............................................................................................. 21

    2. Cell Phones were Seized in the Jeep Pursuant to a Valid Search Warrant

        Following a Lawful Inventory Search ...................................................................... 21

**D. Defendant's Statements to Law Enforcement were Voluntary** ............................. 23

**E. Identifications Made at Show-Up will not be Suppressed** ..................................... 24

    1. Show-Up Identifications were Unduly Suggestive ........................................... 24

    2. The Show-Up Procedures were Reliable and will not be Suppressed ................ 26

**IV.   CONCLUSION** ....................................................................................................... 27

## I.      INTRODUCTION

In this case, Defendants Germaine Lewis and Justice Harris[1] ("Defendants") are charged with conspiracy to possess, utter, or attempt to utter counterfeit currency, and conspiracy to commit robbery which interferes with interstate commerce.  (Doc. No. 57.)  Defendants also are charged with possession of counterfeit currency and robbery which interferes with interstate commerce.  (See id. at 1-18.)  These charges stem from robberies of multiple businesses between January 14, 2022 and August 27, 2022.  (See id. at 2-3.)  Four individuals allegedly participated in the attempted thefts: Defendants Germaine Lewis ("Defendant Lewis"), Justice Harris ("Defendant Harris"), Tahir Rivers ("Defendant Rivers"), and Daniel Faison.[2]  (See id.)

On August 26, 2022, Defendant Lewis and co-robber Daniel Faison were arrested after allegedly committing a robbery (the "August 26 Robbery").  (Doc. No. 83 at 22, 60.)  On that same day, Defendants Harris and Rivers evaded arrest.  (See id.)  The August 26 Robbery also led to the search of a silver Jeep Patriot, the getaway car used during several robberies.  (See id. at 100-102.)  The Jeep was owned by Daniel Faison.  (Doc. No. 79 at 22-23.)  Following the arrests, the Jeep was impounded by police.  (See id.)

During a search of Defendant Lewis incident to his arrest, law enforcement seized approximately $4,000 in counterfeit and authentic currency from his person.  (See id.)  Additionally, during the search of the silver Jeep pursuant to a validly obtained warrant, law enforcement seized three cell phones found on the floorboard of the Jeep.  (Doc. No. 83 at 10.)

---

[1]  Defendant Tahir Rivers is also a Defendant in the case but did not join in the Motion to Suppress filed by his Co-Defendants.  (See Doc. No. 85 at 2.)

[2]  Daniel Faison also is a Defendant in this case.  He pled guilty to participating in several of the offenses and has been sentenced.  (Doc. Nos. 50, 55, 94.)

On August 27, 2022, the following day, Defendants Harris and Rivers were arrested after allegedly attempting to rob a Dollar Store.  (Doc. No. 79 at 23.)

On May 17, 2023, a grand jury returned a second superseding indictment against Defendants Lewis and Harris charging them with: 1) one count of conspiracy to possess, utter, and attempt to utter counterfeit currency, in violation of 18 U.S.C. § 371; 2) one count of conspiracy to commit Hobbs Act Robbery, in violation of 18 U.S.C. § 1951(a); 3) five counts of possession of counterfeit currency and aiding and abetting, in violation of 18 U.S.C. §§ 472 and 2; and 4) eight counts of Hobbs Act Robbery and aiding and abetting, in violation of 18 U.S.C. §§ 1951(a) and 2.  (See Doc. No. 57 at 1.)

Before the Court is Defendants Lewis and Harris' Motion to Suppress.[3]  (Doc. No. 74.)  In the Motion, Defendants Lewis and Harris ("Defendants") argue that the Court should suppress any evidence "illegally seized" by law enforcement from them or the automobile in which they were passengers before the arrests.  (Id. at 33.)  In addition, Defendants "request[] this Court to suppress any statements the [Defendant Lewis] is alleged to have made following the seizure."  (Id.)  In support, Defendants contend that: (1) "there was no probable cause to justify the stop of the vehicle in this case," (2) "even if the stop of the vehicle is found to be justified, there was no reasonable cause or suspicion to justify the subsequent warrantless search of [Defendant Lewis] and the auto[mobile]," and (3) "[b]ecause the search was illegal, all evidence seized from the illegal search,

---

[3] On July 31, 2023, Defendant Lewis filed a First Motion for Discovery and other Pretrial Motions. (Doc. No. 74.)  In the Motions, Lewis moved to suppress physical evidence, statements, and identifications.  (See id.)  On August 8, 2023, Defendant Harris filed a Motion for Joinder in Defendant Lewis' Pretrial Motions.  (Doc. No. 75.)  On September 11, 2023, the Court granted Defendant Harris' Motion for Joinder.  (Doc. No. 81.)  Only Defendant Lewis and Defendant Harris are parties to the Motion to Suppress.

must be suppressed." (Id. at 35.)  Additionally, Defendants argue that show-up identifications[4] should be suppressed because they were unduly suggestive and unreliable.  (Id. at 36.)

The Government filed a Response in Opposition, submitting that the searches, seizures, and identifications were lawful.  (Doc. No. 79.)  First, as a threshold issue, the Government argues Defendants do not have standing to challenge the stop and seizure of the vehicle because they were merely passengers.  (See id. at 48.)  Second, the Government asserts that there was reasonable suspicion to stop the silver Jeep.  (See id. at 49.)  Third, the Government argues that there was a valid search warrant and probable cause to search the automobile.  (See id. at 52.)  Fourth, the Government submits that currency taken from Lewis was lawfully seized based upon a search incident to arrest.[5]  (See id. at 53.)  Finally, the Government claims that the identifications were not unduly suggestive, and even if they were, the identifications were reliable.  (See id. at 55-62.)

On September 13, 2023, an evidentiary hearing was held on the Motion to Suppress.  (Doc. No. 83.)  At the hearing, Philadelphia Police Officer Vincent Pinto ("Pinto" or "Officer Pinto"), who made the traffic stop and participated in the subsequent arrests, testified.  (See id. at 21.)  In addition, the Government played multiple recordings of body camera footage taken on the evening

---

[4] A "show-up" identification occurs when an eyewitness to a crime is presented with only one or two suspects and asked to make an identification.  See Manson v. Brathwaite, 432 U.S. 98, 107 (1977).  A show-up identification may occur at the scene of the crime.

[5] Defendant Harris was arrested on August 27, 2022.  (Doc. No. 79 at 23.)  Officers conducted a search incident to his arrest.  (See id. at 53.)  Counterfeit money was taken from him.  (See id.)  Although Defendant Harris only filed a Motion for Joinder in Defendant Lewis' pre-trial Motions, including the Motion to Suppress, Defendant Lewis' Motion to Suppress makes no mention of the counterfeit currency seized from Defendant Harris on August 27, 2022.  (See Doc. Nos. 74, 75.)  The Government still seeks to "establish[] the admissibility of all evidence seized from Harris on the grounds of search incident to arrest."  (Doc. No. 79 at 54, n.4.)  But because Defendant Harris did not raise this issue, this Opinion need not address the legality of the seizure of the currency from Defendant Harris.

of August 26, 2022, leading to the arrest of Lewis.  (See id. at 21-114).  For the following reasons, Defendants' Motion to Suppress (Doc. No. 74) will be denied.

## II.    FINDINGS OF FACT

### A.  Robbery at Walmart Store and Viewing of Surveillance Footage

On September 13, 2023, the evidentiary hearing was held in this case.  (Doc. No. 83.)  At the hearing, Officer Pinto was the only witness who testified.[6]  The following facts were adduced at the hearing.

On August 26, 2022, while on duty, Officer Pinto received a "priority one" radio assignment that a robbery was in progress at a Walmart Store located at 4640 Roosevelt Boulevard (the "Walmart Store").  (Id. at 23.)  Pinto testified that a "priority one" call means that the issue warrants "top priority" and an officer should "stop what [he is] doing and respond to that incident" due to "the seriousness of the crime."  (Id.)  The radio call noted that "three Black males [] were attempting to take a cash register" at the Walmart Store.  (Id.)

Officer Pinto responded to the radio assignment and went to the Walmart Store.[7]  (See id.) When he arrived, Pinto contacted security, spoke to the cashier who was at the register during the attempted robbery, and viewed the security office footage from multiple camera angles showing the men entering the store, attempting to remove the cash register, and exiting the store.  (See id. at 24-38.)  Pinto testified that he viewed this footage to "obtain descriptions of actors, witness information and possible vehicle information."  (Id. at 24.)  Based upon the surveillance footage, Officer Pinto made several observations.  (See id.)

---

[6] At the time of the arrests, Officer Pinto had worked for the Philadelphia Police Department for six years.  (Doc. No. 83 at 22.)  Previously, he was a police officer in Delaware County.  (Id.)

[7] The following events, including the surveillance footage in the Walmart, pursuit of the fleeing silver Jeep, and arrest of Defendant Lewis were recorded on Officer Pinto's body-worn camera. (Id. at 24-65.)

First, Pinto observed that one man involved in the incident had two notable tattoos on his arm: one tattoo with the letters "M-F-K," and one tattoo with the letter "J." (Id. at 32.) This same man was wearing a gray New Balance hat, gray shorts, and a black shirt. (Id. at 32, 62.) Notably, this man was wearing distinctive orange and black Nike Air Jordan sneakers. (Id.)

Second, he observed another man involved in the attempted theft holding UNO cards and wearing "a gray or a greenish Supreme hat" and a white t-shirt. (Id. at 35, 62.) This man was wearing blue and black Jordan sneakers. (Id.)

Third, Pinto observed a third man, later identified by Pinto as Defendant Germaine Lewis, wearing a "black t-shirt, gray sweat shorts with white strings, a black Boston Red Sox hat, and a black [COVID-19] mask." (Id. at 35-36.) This man was wearing unique red and black Jordan sneakers. (Id.) Pinto also noted that the Boston Red Sox hat stood out to him because it is rare to see people wearing a Red Sox hat in Philadelphia. (Id. at 34.) Pinto observed this man attempt to pull the cash register from the lock and take it. (Id. at 36-37.)

Fourth, he observed that after the attempted theft, the three men entered a silver colored "older model" SUV in the parking lot of the Walmart. (Id. at 24, 28-29.) The SUV appeared to be either a "Jeep Patriot or Jeep Liberty." (Id.) Pinto transmitted this information to police radio personnel to broadcast the vehicle description. (Id. at 30.)

### B.  Officer Vincent Pinto Positions his Police Vehicle on Roosevelt Boulevard

After viewing the surveillance footage at the Walmart Store, Officer Pinto began driving to police headquarters to turn in a police report on the incident. (Id. at 38.) While doing so, he was "made aware of a police radio of a similar incident that occurred at the Walmart which is located at Roosevelt Boulevard and Grant Avenue . . . approximately four or five miles" from the Walmart at 4640 Roosevelt Boulevard. (Id.) The robbery seemed similar to the robbery of the

first Walmart store because they both involved three Black men attempting to take a cash register. (See id. at 39.)  Following the second Walmart incident, Pinto heard of a third incident at a Ross Store on Cottman Avenue.  (Id. at 39-40.)  Due to the proximity of these three locations, Pinto "believed that the suspects were traveling southbound using Roosevelt Boulevard."  (Id. at 40.) Pinto therefore positioned his police vehicle facing southbound traffic at the intersection of Roosevelt Boulevard and Devereaux Avenue to observe traffic coming from Cottman Avenue, the scene of the third attempted theft at the Ross Store.  (See id. at 40-41.)  His lights and sirens were off at this time.  (See id.)

While positioned at this intersection, Officer Pinto saw a silver Jeep Patriot, which he recognized to be similar in color and shape to the silver Jeep associated with the first robbery.  (See id. at 42.)  The Jeep also appeared to be of the same approximate model year of the vehicle he observed in the Walmart surveillance footage.  (See id.)  At this point, approximately twenty minutes had passed since the first incident at Walmart, and less than ten minutes after the incident at the Ross store.  (See id.)  Because he recognized the vehicle from the first Walmart incident, Officer Pinto pulled out from where he had positioned his police vehicle, got behind the silver Jeep Patriot, and identified the Pennsylvania registration plate.  (See id.)

### C.  Officer Vincent Pinto Follows the Jeep to Bridge Street

Officer Pinto followed the vehicle southbound from the intersection of Roosevelt Boulevard and Devereaux Street to Bridge Street, approximately .8 miles.  (See id. at 42-43.) While following the Jeep, Pinto observed that there were several males inside the vehicle.  (Id.) He therefore called for backup because he would be outnumbered by the men in the vehicle during a "very high-risk vehicle stop."  (Id. at 43.)  The Jeep turned onto Bridge Street and stopped in the middle of the block.  (See id. at 43.)

On Bridge Street, Pinto stopped approximately two or three car lengths behind the vehicle. (See id. at 44-45.)  At this time, Pinto's spotlight was on to view the individuals inside the vehicle. (Id.)  Although the Jeeps' windows were "lightly tinted," Pinto was able to view the occupants inside due to the bright spotlight.  (Id. at 44.)  He observed at least three individuals, one of whom turned around and looked at him.  (See id. at 45.)  When the man turned around, Pinto observed that he was wearing a Black Boston Red Sox hat.  (See id. at 44-45.)  Pinto recognized this hat as the one he saw a robber wearing in the footage of the first Walmart incident.  (See id. at 45.)

At this point, Pinto believed with "one hundred percent certainty" that this was the vehicle involved in the robberies.  (Id. at 45.)  The Jeep remained stopped on Bridge Street with Pinto approximately two or three car lengths behind the vehicle.  (See id. at 44-45.)  Pinto activated his lights and sirens.  (See id.)  He noticed that the Jeep's brake lights were still on, typically "an indication that somebody may attempt to flee."  (Id. at 46.)

"Radio Patrol Wagon 200," a large police van marked with "POLICE" on all sides, arrived to back up Officer Pinto on Bridge Street.  (Id. at 47.)  The patrol wagon came from the direction of Loretto Street, so when it arrived it faced both the Jeep Patriot and Officer Pinto's vehicle.  (See id. at 47.)  At that time, the Jeep fled from the stop.  (See id.)  Because Pinto believed that the vehicle was involved with "very violent forcible felonies," Officer Pinto initiated a pursuit with his lights and sirens activated.  (Id. at 48-49.)

**D.  Pursuit of Fleeing Jeep down Roosevelt Boulevard**

As shown during the evidentiary hearing in video footage from Pinto's body-worn camera, the silver Jeep recklessly fled from police and engaged in dangerous evasive driving maneuvers. (See Doc. No. 83.)

After fleeing from Bridge Street, the Jeep made a "very unsafe" turn, heading the wrong way down a one-way residential street.  (Id. at 48.)  Next, the Jeep turned onto the outer lanes[8] of Roosevelt Boulevard, again heading southbound.  (See id. at 50.)  At this time, Officer Pinto observed the backup patrol wagon attempt to stop the Jeep by pulling up on the right side of his vehicle, directly behind the Jeep.  (See id. at 49-51.)  However, before the patrol wagon could get in front of the Jeep, the Jeep became stuck at a traffic light on Roosevelt Boulevard.  (See id. at 49.)  To escape, the Jeep backed into and hit Officer Pinto's vehicle and then sideswiped the driver's side of the patrol wagon, veering left to illegally jump a grassy median and continue southbound on Roosevelt Boulevard, now traveling on the inner lanes of traffic.  (See id. at 50.)

Officer Pinto pursued the Jeep as it traveled down the inner lanes of Roosevelt Boulevard, heading southbound.  (See id.)  Then the pursuit approached the intersection of Roosevelt Boulevard and Summerdale Avenue.  (See id. at 50-51.)  At this intersection, the Jeep sharply turned left onto Summerdale Avenue to proceed northbound on Roosevelt Boulevard, heading back the opposite direction.  (See id. at 51.)

During the pursuit on Roosevelt Boulevard, Officer Pinto observed multiple traffic and criminal violations committed by the Jeep, including reckless driving, speeding, hit and run of a police vehicle, changing lanes unsafely, and jumping a median.  (See id.)  Additionally, Officer Pinto observed the Jeep traveling at approximately fifty miles per hour in zones limited to forty and twenty-five miles per hour.  (See id. at 51.)

---

[8] Under Federal Rule of Evidence 201(b)(2), courts may take judicial notice of facts which "can be accurately and readily determined from sources whose accuracy cannot be reasonably be questioned."  Fed. R. Evid. 201(b)(2).  The Third Circuit has held that it is appropriate to take judicial notice of matters of public record as a source whose accuracy cannot reasonably be questioned.  Gagliardi v. Kratzenberg, 188 F. App'x 86, 88 n.3 (3d Cir. 2006).  According to publicly available online maps, such as Google Maps, there are four lanes of traffic heading Southbound on Roosevelt Boulevard.  A grassy median separates the inner two lanes and outer two lanes of traffic.

### E.  Pursuit On Foot and Arrest of Defendant Germaine Lewis

After proceeding northbound on Roosevelt Boulevard, the Jeep turned right onto Cheltenham Avenue.  (See id.)  Officer Pinto pursued the Jeep down Cheltenham Avenue.  (See id.)  After traveling approximately one-half mile on Cheltenham, the Jeep abruptly turned right onto Saul Street, taking the turn too quickly and skidding to a stop.  (See id.)  As a result, Officer Pinto's vehicle skid and struck the Jeep from the rear.  (See id. at 52.)  After both cars came to a sudden stop, three men fled from the Jeep on Saul Street, from both the driver's and passenger's sides of the vehicle.  (See id.)  Defendant Harris fled and escaped, avoiding arrest.  (Doc. No. 79 at 23.)[9]  Officer Pinto pursued the other two men who had run in the same direction: the driver, Daniel Faison, and Defendant Germaine Lewis.  (See id. at 53.)

Daniel Faison ran eastbound in front of row homes on Cheltenham Avenue.  (See id. at 53.)  Defendant Lewis ran down a rear alleyway near Cheltenham Avenue, and Officer Pinto pursued him on foot.  (See id. at 52-53.)  Officer Pinto observed that Lewis was wearing a black t-shirt, gray sweat shorts, and Jordan sneakers.  (See id. at 52.)  During the chase, Officer Pinto repeatedly instructed Lewis to put his hands up and in effect said he would tase him to stop his flight from law enforcement and to take him into custody.  (See id. at 53.)  When Pinto apprehended Defendant Lewis, he was no longer wearing the Boston Red Sox hat or the black surgical mask.  (See id. at 54.)  Pinto recovered a surgical mask from the alley where Defendant Lewis was arrested.  (See id.)  At the evidentiary hearing, Officer Pinto testified that he had probable cause to take Lewis into custody based upon the robberies that occurred and flight from the police.  (See id. at 53.)

---

[9] While the Government states that Defendant Tahir Rivers is seen on surveillance footage at all three robberies on August 26, 2022, it is unclear whether he fled from the Jeep on Saul Street. (Doc. Nos. 79, 99.)  On August 27, 2022, he was arrested following the theft of a Dollar Store, along with Defendant Justice Harris.  (Doc. No. 79 at 23.)

### F.  Search of Defendant Lewis in the Radio Patrol Wagon

Following Lewis' arrest, Officer Pinto brought him to the police radio patrol wagon for transport.  (See id. at 55.)  Next, Pinto entered Defendant Germaine Lewis' name into the Mobile Data Terminal ("MDT") for the purposes of identifying him.  (See id.)  The MDT search revealed Defendant Lewis' identity and that he was wanted for robberies that occurred in the sixth and ninth police districts.  (See id.)

Next, Defendant Lewis was searched in accordance with police protocol to search all prisoners prior to transport.  (See id. at 55-56.)  When arresting Defendant Lewis in the alleyway earlier, Officer Pinto had noticed that Defendant Lewis had a large amount of loose currency in his pockets.  (See id. at 56.)  Officer Pinto conducted a search incident to arrest and seized the currency, approximately $4,000 dollars.  (See id. at 55-58, 69.)  Officer Pinto did not ask Lewis any questions during the search, but informed him that his pockets would be searched.  (See id.) During this search, Defendant Lewis said to Officer Pinto, "y'all trying to take my money? . . . that's my money" and later, "what are y'all gonna do with my money?"  (Id. at 57-58.)  Defendant Lewis seeks to suppress these statements made during the search.  The recovered currency was placed on a Philadelphia property receipt.  (See id. at 58.)

### G.  Show-Up Identifications

Approximately an hour later, two witnesses were brought to the location of the arrest, one from each Walmart store.  (See id. at 82.)  The witness from the first Walmart store identified Defendant Lewis and Daniel Faison as perpetrators of the attempted theft.  (See id. at 83.)  When shown the two suspects, the witness said, "that's both of them."  (Id. at 59.)  The witness also noted that the person at the Walmart store wearing the orange and black Jordan sneakers was missing. (See id. at 59-60.)  Additionally, a witness from the second Walmart incident identified Defendant Lewis as the perpetrator.  (See id. at 85-86.)  At the time of the identification, Defendant Lewis

was in handcuffs and wearing distinctive red and black Jordan sneakers as seen in the Walmart surveillance footage.  (See id. at 60, 63.)

### H.  Search of Jeep Pursuant to Valid Search Warrant

Following the identifications, Officer Pinto returned to the Jeep which had remained at the scene of the arrest.  (See id. at 99-100.)  Pinto observed that the Jeep was still running, the doors were open, and cell phones were inside the vehicle.  (See id.)  Because the driver and owner of the Jeep, Daniel Faison, was also arrested, the vehicle was towed from the location, and an inventory search was completed on the vehicle.[10]  (See id. at 100.) During an inventory search, Philadelphia police are instructed to seize anything of evidentiary value, including contraband.  (See id.)  On August 29, 2023, Detective Scarinci, the assigned Detective, obtained a valid search warrant for "at least two cell phones in plain view" on the floorboard of the Jeep, despite three cell phones being recovered from the Jeep pursuant to the valid search warrant.  (Id. at 100-01; Doc. No. 79 at 67-68; Doc. No. 83 at 100-01.)

### I.  Arrest of Defendant Justice Harris the Next Day

On August 27, 2022, Defendants Harris and Rivers entered a Dollar Store and robbed the cash register.  (Doc. No. 79 at 23.)  When Defendants Harris and Rivers fled, they were pursued by Philadelphia Police into the rear of a barbershop.  (See id.)  During this time, Defendant Harris was attempting to dispose of counterfeit money, and he was arrested.  (See id.)[11]

---

[10] Based on Officer Pinto's testimony at the evidentiary hearing, it is unclear whether an inventory search of the Jeep was in fact conducted, or if following receipt of the search warrant, such a step was deemed unnecessary.  (See Doc. No. 83 at 100-02.)

[11] That same day, Defendant Rivers was also arrested.  (Doc. No. 79 at 23.)

### III.    CONCLUSIONS OF LAW

As noted earlier, Defendants Lewis and Harris contend that no probable cause existed to stop the Jeep or arrest Defendant Lewis.  (Doc. No. 74 at 34-36.)  Additionally, Defendants contend that "there was no reasonable cause or suspicion to justify the subsequent warrantless search of [Defendant Lewis] and the auto."  (Id. at 35.)  As a result, Defendants argue that statements allegedly made by Defendant Lewis and tangible evidence seized—including counterfeit and authentic cash and cell phones—should be suppressed as fruit of the poisonous tree.  (Id.)  Finally, Defendants argue that the show-up identifications should be suppressed because they were unduly suggestive and unreliable.  (Id. at 36.)  For reasons that follow, Defendants' Motion to Suppress (Doc. No. 74) will be denied.

#### A.  Officer Vincent Pinto had Reasonable Suspicion to Stop the Jeep

Defendants argue that Officer Pinto stopped the Jeep without probable cause.  (See id. at 35.)  In support of this contention, Defendants claim that Officer Pinto did not observe the driver of the Jeep violating the law.  (See id. at 34.)  Additionally, Defendant argues that "there was not a description of the car that would have been sufficient to stop the car" as there was no evidence of the license plate number and no males were seen on surveillance footage getting into or out of the Jeep.  (Id.)

However, under the Fourth Amendment to the United States Constitution, an officer is not required to have probable cause to make an investigatory stop in all cases.  See Terry v. Ohio, 392 U.S. 1, 30-31 (1968).  Instead, when conducting a short, investigatory Terry stop, an officer need only have "reasonable suspicion" that criminal activity "may be afoot."  Id.  Here, Officer Pinto had reasonable suspicion to stop the Jeep under the Fourth Amendment.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. It provides that this right "shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Id. Evidence obtained in violation of the Fourth Amendment may not be introduced at trial. See Davis v. United States, 564 U.S. 229, 232 (2011). On a motion to suppress, "the burden of proof is on the defendant who seeks to suppress evidence." United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995) (internal citations omitted). Generally, warrantless searches are presumed to be unreasonable, and suppression of all evidence obtained from an unreasonable search is the appropriate remedy. See id. (citing Cady v. Dombrowski, 443 U.S. 433, 439 (1973)).

One exception to the warrant requirement is a Terry investigatory stop. In Terry v. Ohio, the United States Supreme Court established an exception to the warrant requirement for "brief investigatory stops" made when the police officer has a "reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry, 392 U.S. at 30). "[R]easonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." Id. However, an officer must articulate more than a "hunch" or "inchoate . . . suspicion" of criminal activity to establish reasonable suspicion. Id. (quoting Terry, 392 U.S. at 27).

When making a Terry stop, a police officer "must be able to point to  specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21. Officers may also "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information

available to them that might well elude an untrained person." United States v. Brown, 765 F.3d 278, 290 (2014) (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)). Courts "give considerable deference to police officers' determinations of reasonable suspicion." Id. at 290. If an officer did not have reasonable suspicion when the Terry stop was conducted, then the evidence obtained must be suppressed as "fruit of the poisonous tree." Wong Sun v. United States, 371 U.S. 471, 487-88 (1963). The determination of whether reasonable suspicion existed is based on the totality of the circumstances. United States v. Nelson, 284 F.3d 472, 475 (3d Cir. 2002).

Additionally, the Third Circuit Court of Appeals has repeatedly emphasized the importance of proximity to the scene of the crime when determining whether an officer had reasonable suspicion to conduct a Terry stop. See United States v. Robertson, 305 F.3d 164, 168 (3d Cir. 2002). For example, in Robertson, the Third Circuit held that the officer had reasonable suspicion to conduct a Terry stop when the officer observed two suspects sprinting down a city street in close proximity to an armed robbery. 305 F.3d 164, 168 (3d Cir. 2002). Again, in United States v. Brown, the Third Circuit held that the officer had reasonable suspicion to make a Terry stop when the suspect was observed near a shooting scene and initially refused to stop when instructed by an officer to do so. 159 F.3d 147, 149 (3d Cir. 1998).

Here, the totality of the circumstances indicates that Officer Pinto had reasonable suspicion to conduct a Terry stop of the silver Jeep. While positioned on Roosevelt Boulevard, in close proximity to the crime scenes, Pinto observed a silver Jeep Patriot which had similar features to the one he observed in the Walmart footage. (See Doc No. 83 at 42.) Importantly, when he followed the Jeep and pulled up behind the vehicle on Bridge Street, he observed a man in the backseat wearing the same distinctive Boston Red Sox hat as the perpetrator he saw in surveillance footage. (See id. at 44-45.) At this point, Officer Pinto testified that he believed with "one hundred

16

percent certainty" that this Jeep was involved in the string of crimes.  (Id. at 45.)  Just as the officers in Robertson and Brown had reasonable suspicion to make a Terry stop based upon the proximity to the crime scene, Officer Pinto had reasonable suspicion to conduct the Terry stop based upon his observations of the silver Jeep, the distinctive Red Sox hat, and the proximity in time and space between the incidents at the two Walmart stores and Ross store.  Not only had Officer Pinto broadcast to police radio a description of the silver Jeep, but he was also alerted to two similar incidents where multiple black men attempted to steal a cash register, all occurring within a twenty-minute time frame and within a few miles of each other.  (See id. at 38-40.)

Thus, viewing the totality of the circumstances, and based on his experience and training, Officer Pinto had reasonable suspicion to believe that "criminal activity was afoot" and make an investigatory stop of the vehicle on Bridge Street.  This was not merely a "hunch."  Pinto saw three men in the vehicle, one of whom had on a distinctive hat that Pinto observed in the surveillance footage of the attempted theft at the first Walmart.  Additionally, the vehicle matched the make, color, and model year of the silver Jeep Patriot viewed on Walmart surveillance footage.  Given the proximity in time and location between the reported incidents over police radio and the identifying features of the Jeep and the Red Sox hat, Officer Pinto drew reasonable inferences from specific and articulable facts available to him.  Because reasonable suspicion was present, there is no need to determine whether the instant circumstances amounted to probable cause to stop the Jeep.[12]

---

[12] After the Jeep fled the scene to evade the patrol wagon and was pursued by Officer Pinto on Roosevelt Boulevard, the initial stop of the Jeep on Bridge Street based on reasonable suspicion now ripened into probable cause to stop and search the Jeep and detain the occupants, as discussed more fully infra.

**B. Officer Vincent Pinto had Probable Cause to Search Defendant
Germaine Lewis Incident to His Arrest**

Defendants argue that "there was no reasonable cause or suspicion to justify the . . . warrantless search of Mr. Lewis . . . " (Doc. No. 74 at 35.)  Further, Defendants assert that "[b]ecause the search was illegal, all evidence seized from the illegal search must be suppressed." (Id.)  In support of this argument, Defendants assert that "anything found . . . on Mr. Lewis was fruit of the poisonous tree." (Id.)

1.   Officer Pinto had Probable Cause to Arrest Defendant Germaine Lewis

When making an arrest, an officer must have probable cause.  United States v. Lanville, 480 F.3d 187, 194 (3d Cir. 2007) (citing Draper v. United States, 358 U.S. 307, 313 (1959)).  As the Third Circuit stated in Lanville:

> [p]robable cause exists whenever reasonably trustworthy information or circumstances within an arresting officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been or is being committed by the person being arrested.

Id. at 189.  Additionally, "it is well established that where police officers reasonably suspect that an individual may be engaged in criminal activity, and the individual deliberately takes flight when the officers attempt to stop and question him, the officers generally no longer have mere reasonable suspicion, but probable cause to arrest." Id. at 195.

Here, Officer Pinto had probable cause to arrest Defendant Lewis.  First, when Pinto turned on his lights and sirens to conduct an investigatory stop of the Jeep, he had reasonable suspicion that the Jeep was involved in the string of crimes, one of which he observed on surveillance footage and all broadcast over police radio.  (Doc. No. 83 at 45.)  At that point, the Jeep fled, giving rise to Officer Pinto's probable cause to arrest the occupants of the vehicle.  (See id. at 47.) Additionally, during flight, multiple dangerous traffic violations were committed, including

speeding, reckless driving, driving the wrong way down a residential one-way street, jumping a median, deliberately reversing into a police car, and sideswiping another police car.  (See id. at 50.)  And after the Jeep crashed to a stop on Saul Street, the occupants fled on foot.  (See id. at 51.)

Based upon Officer Pinto's observations of the Walmart surveillance footage, the Jeep's deliberate evasion of the police stop, the dangerous traffic violations committed while fleeing, and Defendants' continued flight on foot, Officer Pinto had probable cause to apprehend the occupants of the Jeep, including Defendant Lewis and take him into custody.

     2.    Officer Vincent Pinto Conducted a Lawful Search of Defendant Germaine Lewis Incident to his Arrest

As noted above, without a warrant, a search or seizure must fall within a specific exception to the general warrant requirement.  See Riley v. California, 573 U.S. 373, 382 (2014).  A search incident to a proper custodial arrest is an exception to the general warrant requirement.  See id. The United States Supreme Court has held that an arresting officer conducting a search incident to an arrest may search the "arrestee's person and the area 'within his immediate control.'"  Id. at 383 (citing Chimel v. California, 395 U.S. 752, 762-63 (1969)).  As the Court held in Chimel,

> [w]hen an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.... There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

395 U.S. at 762-63.  Again, in Robinson, the Supreme Court held that a search incident to an arrest based upon probable cause was

a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment.

414 U.S. 218, 235 (1973).

Here, Officer Pinto conducted a reasonable search of Defendant Lewis incident to the arrest. First, Officer Pinto only searched the area within Defendant Lewis' person following his arrest. (Id. at 56-57.) Officer Pinto testified that he felt a large amount of loose money in Lewis' pockets while arresting him. (Id. at 56.) After bringing Defendant Lewis to the radio patrol wagon for transport, his pockets were searched consistent with police protocol. (See id.) While searching Lewis' person, Officer Pinto seized the loose currency in Defendant Lewis' pockets, totaling approximately $4,000 dollars. (See id. at 13, 56-58.) The search was reasonable to "prevent [the] concealment or destruction" of evidence in the form of counterfeit currency. See Chimel, 395 U.S. at 762-63. Because the Terry stop was supported by reasonable suspicion, the arrest was supported by probable cause, and the search incident to the arrest was reasonable, falling under a specific exception to the general warrant requirement, the currency seized is not fruit of the poisonous tree. Therefore, it will not be suppressed.

### C. Defendants Lewis and Harris do not have Standing to Challenge the Search of the Jeep

Defendants contend that "there was no reasonable cause or suspicion to justify the . . . warrantless search of . . . the auto." (Doc. No. 74 at 35.) In addition, Defendants argue that "[b]ecause the search was illegal, all evidence seized from the illegal search must be suppressed." (Id.) In support of this argument, Defendants note that "anything found in the car . . . was fruit of the poisonous tree." (Id.)

### 1. Defendants Lewis and Harris do not have Standing to Challenge the Search of the Jeep

The United States Supreme Court has held that a mere passenger in a vehicle does not have standing to challenge the search of the vehicle.  See Rakas v. Illinois, 439 U.S. 128, 148-49 (1978). In Rakas, the petitioners convicted of armed robbery challenged the search and seizure of evidence from a vehicle in which they had been passengers.  Id. at 129-30.  The owner of the vehicle was the driver.  Id. at 130.  In upholding the denial of petitioner's motion to suppress the evidence seized, the Supreme Court emphasized that "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted."  Id. at 133-34 (quoting Alderman v. United States, 394 U.S. 165, 174 (1969)).  Therefore, because they were "passengers occupying a car which they neither owned nor leased," they lacked

> any legitimate expectation of privacy in the glove compartment or area under the seat of the car . . . Like the trunk of an automobile, these are areas in which a passenger qua passenger simply would not normally have a legitimate expectation of privacy.

Id. at 140, 149.

Here, on August 26, 2022, Daniel Faison was the registered driver of the Jeep and was in fact driving the vehicle during the dangerous flight from law enforcement on Roosevelt Boulevard. (Doc. No. 83 at 100.)  Defendants Lewis and Harris were both passengers in Faison's Jeep.  (See id.)  They had no legitimate expectation of privacy in the Jeep and do not have standing to challenge the seizure of the phones found on the floorboard.  (Id. at 99-100.)

### 2. Cell Phones were Seized in the Jeep Pursuant to a Valid Search Warrant Following a Lawful Inventory Search

Even if Defendants had a privacy interest in the Jeep, the seizure of the cell phones was lawful because they were seized pursuant to a valid search warrant following a lawful inventory search of the Jeep.  Although Defendants argue that the cell phones seized from the Jeep should

be suppressed as they are fruit of the poisonous tree resulting from a warrantless search of the automobile, the Court disagrees.  (See Doc. No. 74 at 35.)  The Jeep was lawfully taken into custody by police to conduct a routine inventory search, and the Government subsequently obtained a valid warrant to seize the cell phones.

Both inventory searches and searches pursuant to a valid warrant are reasonable under the Fourth Amendment.  First, inventory searches pursuant to routine police procedures are reasonable under the Fourth Amendment.  See South Dakota v. Opperman, 428 U.S. 364, 372-73 (1976). Following a driver's arrest, the arrestee's automobile is generally taken into police custody "in the interests of public safety." Id. at 368.  Afterwards, police typically conduct a "routine practice of securing and inventorying the automobile's contents." Id.  Such searches are reasonable under the Fourth Amendment.  See id. at 376.  Second, searches undertaken pursuant to a warrant and supported by probable cause are explicitly permitted by the Fourth Amendment.  See Griffin v. Wisconsin, 483 U.S. 868, 873 (1987).

Here, on August 26, 2023, the silver Jeep was taken into police custody following the arrests, and in accordance with routine procedure, the police apparently conducted an inventory search of the Jeep to collect anything of evidentiary value or contraband.[13]  (Doc. No. 83 at 101.) While the car was in police custody, the assigned Detective applied for and obtained a search warrant for "at least two cell phones in plain view" in the Jeep.  (Doc. No. 79 at 66-68.)  The detective "request[ed] a search warrant to process [the Jeep] [and] recover said cell phones."  (Id. at 67.)

Three cell phones were recovered from the Jeep pursuant to the search warrant.  (Doc. No. 83 at 101.)  In short, the vehicle was impounded pending a reasonable inventory search consistent

---

[13]  Based upon Officer Pinto's testimony, it is unclear whether an actual inventory search was in fact conducted prior to obtaining the search warrant.  (Doc. No. 83 at 99-101.)

with police procedures, and the assigned detective obtained a valid search warrant and recovered three cell phones pursuant to the warrant.  The cell phones therefore are not fruit of the poisonous tree and will not be suppressed.

### D.  Defendant's Statements to Law Enforcement were Voluntary

Next, Defendants contend that this Court should "suppress any statements [Defendant Lewis] is alleged to have made following the seizure" of the vehicle and his detention.  (Doc. No. 74 at 33.)  In support of this argument, Defendants argue that Lewis "may have made a statement" following his arrest.  (Id. at 34.)  Further, Defendants contend that "[a]ny statements or evidence procured as a result of [the] unlawful search should be considered the tainted fruits of that illegal search . . .  and must be suppressed."  (Id. at 36.)  Finally, Defendants contend that "any statements or recordings taken without the presence of an attorney and without first informing [Defendant Lewis] of his rights should be suppressed . . ."  (Id. at 35.)

When a defendant is questioned by police in a "custodial interrogation," the defendant must be apprised of his Miranda rights and have counsel present.  See Miranda v. Arizona, 384 U.S. 436, 444, 467-68 (1966).  The United States Supreme Court has defined a "custodial interrogation" as one where "questioning [is] initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  Id. at 444. During a custodial interrogation, a defendant "must first be informed in clear and unequivocal terms that he has the right to remain silent."  Id. at 467-68.  Additionally, counsel must be present during a custodial interrogation.  See id. at 469.  However, "any statement given freely and voluntarily without any compelling influences, is, of course, admissible in evidence."  Id. at 478.

Here, Defendant Lewis made spontaneous statements as he was being arrested, placed into the Radio Patrol Wagon, and searched incident to his arrest.  (Doc. No. 83 at 57.)  While being

searched, Defendant Lewis stated, without being questioned by police: "y'all trying to take my money? . . . that's my money," and "what are y'all gonna do with my money?"  (<u>Id.</u> at 57-58.) When Defendant Lewis made these remarks, no officer had initiated questioning of Defendant Lewis.  This statement was given voluntarily, seemingly out of frustration that the currency in his pockets was being seized by law enforcement.  (<u>See</u> <u>id.</u>)  There was no custodial interrogation. Lewis was merely being searched incident to his arrest.  Therefore, his statements to the police are not fruit of the poisonous tree.  They were not obtained in violation of <u>Miranda</u> or the Fifth Amendment.

### E.  Identifications Made at Show-Up will not be Suppressed

Finally, Defendants contend that the identification of Defendant Germaine Lewis following his arrest should be suppressed because it was unduly suggestive.  (Doc. No. 74 at 36.) Further, Defendants argue that "the procedure employed was improper in that it created a substantial possibility of mistaken identity."  (<u>Id.</u>)  Additionally, "any in court identification by alleged eyewitnesses at trial would not have a sufficiently independent basis to overcome the violation of due process rights . . ."  (<u>Id.</u> at 38.)

#### 1.  Show-Up Identifications were Unduly Suggestive

In <u>United States v. Brownlee</u>, the Third Circuit Court of Appeals held that "an identification procedure that is both (1) unnecessarily suggestive and (2) creates a substantial risk of misidentification violates due process."  454 F.3d 131, 137 (3d Cir. 2006) (quoting <u>Manson v. Brathwaite</u>, 432 U.S. 98, 107 (1977)).  During a "show-up" identification procedure, "a single individual arguably fitting a witness's description is presented to that witness for identification." <u>Id.</u> at 138.  The Third Circuit has noted that a show-up identification is "inherently suggestive

because, by its very nature, it suggests that the police think they have caught the perpetrator of the crime." Id. at 137-38.

When a show-up identification takes place while the defendant is in handcuffs or in conditions "reeking of criminality," the Third Circuit has held that the identification is unduly suggestive. Id. at 137. For example, in Brownlee, the Third Circuit held that the show-up identification was unnecessarily suggestive when the defendant was "handcuffed and seated in the back seat of a police cruiser when identified by [the witnesses], and he was handcuffed and pulled out of the police cruiser when [other witnesses] identified him." Id. at 138. Further, the Court opined that the context of the identification was unduly suggestive:

> [n]ot only was Brownlee handcuffed, surrounded by police officers, and either seated inside or standing beside a police cruiser at the time of the identifications, he was also at the scene of the accident—a condition that creates the impression the police had caught him in the stolen Jeep.

Id. Additionally, "there [was] no reason evident why [the defendant] and the witnesses could not have been taken to the police station for a less suggestive line-up or photo array." Id.

Here, the show-up identifications were also unduly suggestive. Like the defendant in Brownlee, Defendant Lewis was identified by the eyewitnesses from both Walmart stores while handcuffed at the scene of the arrest. Further, the show-ups were conducted while Defendant Lewis was in a radio patrol wagon surrounded by police officers. Just as the show-up in Brownlee created the impression that the police had caught the defendant in the criminal act, the show-ups here similarly created an unduly suggestive impression that a suspected criminal had been caught by law enforcement. Additionally, there was no reason given, beyond exigency, that Lewis and the eyewitnesses could not have relocated to the police station for a less suggestive lineup. Thus, the show-up identifications were unduly suggestive.

2.   <u>The Show-Up Procedures were Reliable and will not be Suppressed</u>

Notwithstanding the suggestive nature of the show-ups, the identifications of Lewis by the witnesses from both Walmart stores will not be suppressed because they possess sufficient aspects of reliability.  See <u>Brownlee</u>, 454 F.3d at 138-139.

As the Third Circuit stated in <u>Brownlee</u>, "unnecessary suggestiveness alone does not require the exclusion of evidence."  <u>Id.</u> at 138 (citing <u>Neil v. Biggers</u>, 409 U.S. 188, 198-99 (1972)).  If the identification procedure "possesses sufficient aspects of reliability," it will not violate due process.  <u>Id.</u> at 139.  To determine whether the identification was sufficiently reliable, courts look to the totality of the circumstances and consider the following factors:

> (1) [T]he opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and confrontation.

<u>Id.</u>

Here, the <u>Biggers</u> factors weigh in favor of reliability.  First, the witnesses had the opportunity to view Defendant Lewis at the time of the crime at well-lit Walmart stores and at close range.[14]  (<u>See</u> Doc. No. 83 at 29-36.)  Second, based on the surveillance footage viewed at the hearing, the witnesses were paying sufficient attention.  (<u>See id.</u>)  Third, the witnesses' prior descriptions of Defendant Lewis were fairly accurate.  For example, at the Walmart, Defendant Lewis was described by eyewitnesses as having on gray sweat shorts and Jordan sneakers.  (<u>See id.</u> at 52.)  Then, at the show-up identification, the witness from the first Walmart noted that one suspect with red and black Jordan sneakers—Defendant Lewis—was present, but one with "the other" orange and black Jordans appeared to be missing.  (<u>Id.</u> at 59-60.)  Thus, the witness' prior

---

[14] Despite the fact that the alleged robbers were wearing COVID-19 masks, enough of their faces and other characteristics were exposed to support an identification.  The reliability of the identifications is for a jury to decide.

description was sufficiently accurate.  The fourth factor also weighs in favor of reliability because the witnesses were quite certain of Defendant Lewis' identity.  For example, when viewing Defendant Lewis and Daniel Faison at the show-up identification, the witness from the first Walmart stated: "that's both of them."  (Id.)  Finally, the fifth factor, the length of time, weighs in favor of reliability because only an hour had passed between the incidents at Walmart stores and the show-up identifications.  (Id. at 82.)

Therefore, while the show-up identifications were unduly suggestive, they also have sufficient indicia of reliability to support their admission.  Accordingly, the show-up identifications will not be suppressed.

## IV.    CONCLUSION

For all the foregoing reasons, Defendants' Motion to Suppress (Doc. No. 74) will be denied.  The following evidence therefore is admissible at trial: (1) the three cell phones recovered from the Jeep, (2) the authentic and counterfeit currency seized from Defendant Lewis, (3) the voluntary statements made by Defendant Lewis, and (4) the show-up identifications made following the arrests.  An appropriate Order follows.